UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ASHTON SMITH,

          Plaintiff,

v.

DONALD HAIDERER, *et al.*,

          Defendants.

_____/

Civil Action No. 23-11509

Brandy R. McMillion
United States District Judge

David R. Grand
United States Magistrate Judge

## REPORT AND RECOMMENDATION ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 63, 64)

On June 26, 2023, *pro se* plaintiff Ashton Smith ("Smith"), who is incarcerated within the Michigan Department of Corrections ("MDOC"), filed a complaint pursuant to 42 U.S.C. § 1983, alleging violations of his rights under the United States Constitution and the Americans with Disabilities Act ("ADA"). (ECF No. 1).[1] Smith named as defendants Health Unit Manager Susan McCauley ("McCauley") and Dr. Donald Haiderer ("Dr. Haiderer") (collectively, "Defendants")[2], and his claims relate principally to treatment he did or did not receive for a serious eye condition he suffers from. (*Id.*).

The case proceeded through discovery, and on October 4, 2024, the Defendants filed separate summary judgment motions. (ECF Nos. 63, 64). Smith filed responses,

---

[1] On April 4, 2024, this case was referred to the undersigned for all pretrial matters pursuant to 28 U.S.C. § 636(b). (ECF No. 33).

[2] Smith also named a Jane Doe defendant. (ECF No. 1). However, Smith has not timely identified her, and with the case having now proceeded through the summary judgment stage, that defendant should be dismissed without prejudice.

Defendants filed replies, and Smith filed sur-replies. (ECF Nos. 76, 78, 79, 82, 84, 86).

Generally, the Court will not hold a hearing on a motion in a civil case in which a party is in custody. *See* E.D. Mich. LR 7.1(f). Here, the Court finds that the facts and legal issues are adequately presented in the briefs and on the record, and it declines to order a hearing at this time.

## I.     RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that McCauley's Motion for Summary Judgment **(ECF No. 63)** be **GRANTED** and Dr. Haiderer's Motion for Summary Judgment **(ECF No. 64)** be **GRANTED IN PART AND DENIED IN PART**.

## II.     REPORT

### A. Background

Smith is currently a MDOC prisoner confined at the Macomb Correctional Facility. He brings this § 1983 civil rights action alleging principally that his rights under the Eighth Amendment were violated while he was housed at the Saginaw Correctional Facility ("SRF") when Defendants were deliberately indifferent by failing to provide appropriate treatment for a serious eye condition that requires a certain type of contact lens, lens solutions, and eye drops, and for failing to approve his use of visual aid accommodations. He also alleges violations of his rights under the First, Fifth, and Fourteenth Amendments, and the Americans with Disabilities Act.

In his complaint, Smith asserts that, prior to being housed at SRF, he underwent corneal transplant surgery to correct inadequate vision caused by a ten-year battle with keratoconus. (ECF No. 1, PageID.2). After the surgery, his vision was still inadequate,

and he was given three accommodations: (1) "specialized contact lenses"; (2) sodium chloride solution (which he refers to as "Addi-Paks") that he claims is an essential component to wearing the specialized contact lenses; and (3) steroid fluorometholone eyedrops to maintain the corneal transplant grafts. (*Id.*, PageID.2-3). He asserts that these three accommodations were given to him with only "minimal interruption" from 2016 until he arrived at SRF in October 2021. (*Id.*, PageID.3).

### *Addi-Paks Solution*

Smith alleges that, when he arrived at SRF on October 5, 2021, Dr. Haiderer and McCauley "confiscated" his Addi-Paks. (*Id.*). He submitted healthcare kites and a grievance, and spoke with a pharmacy tech who told him that his Addi-Paks were locked up in the optometry office and that he would get them in a few days when he is examined. (*Id.*). Dr. Haiderer examined Smith about two weeks later, on October 18, 2021, and allegedly told him to use Boston Simplus lens solution instead of Addi-Paks, notwithstanding his medical documentation supporting his need for the Addi-Paks solution. (*Id.*, PageID.4). Smith further alleges that Dr. Haiderer stated during this examination that, "I had every intention to give you this . . . but you penned that little grievance on me. I got a pen too and my pen is bigger." (*Id.*). Smith alleges that when he protested this by explaining that he had been told by his corneal specialist that Boston Simplus solution would hurt his eye, Dr. Haiderer responded by saying "you should've thought of that before you snitched on me. Leave and kite me if the Boston [Simplus] hurts . . . if it does, add water." (*Id.*).

Smith alleges that he tried the Boston Simplus and water and that both caused pain

3

and inflammation.  (*Id.*).  He therefore reached out to the nurse staff to inquire as to why he was being denied Addi-Paks and was told that he did not need such an accommodation. (*Id.*, PageID.5).  Smith continued to complain and submit healthcare kites.  (*Id.*).

Smith alleges that on November 2, 2021, Dr. Haiderer acknowledged his red and inflamed eye during an examination.  (*Id.*).  Smith contends that he saw a box of Addi-Paks "on the floor," but that Dr. Haiderer emptied them into a garbage can and told him to add in a few drops of the steroid fluorometholone eyedrops into the Boston Simplus/water mix.  (*Id.*).  When Smith protested this and said that he was being "tortur[ed]," Dr. Haiderer allegedly replied, "Don't be a retard.  I'm not giving you anything but a lesson in why you should've just tried to talk things out before penning that grievance on me.  Leave my office before I get you a ticket too!"  (*Id.*, PageID.5-6).  Smith alleges that he experienced more pain and swelling after following these instructions.  (*Id.*, PageID.6).  He also alleges that the replacement of Addi-Paks solution with Boston Simplus caused him to only be able to wear his specialized contact lenses for eight hours per day versus the sixteen to eighteen hours per day he wore them with the Addi-Paks solution because "Boston Simplus contains preservatives and additives that become[] toxic when in contact with the cornea for longer than an hour."  (*Id.*, PageID.7).  He asserts that this is commonly known by eye care professionals, including Dr. Haiderer, but that Dr. Haiderer "disregarded it purposely to cause [Smith's] eyes harm in retaliation for submitted grievances."  (*Id.*).  He alleges that his resulting poor eyesight caused him to be unable to maintain a clean cell, which led to altercations with his cellmates.  (*Id.*, PageID.6-7).  Smith  was eventually provided Addi-Paks solution on February 21, 2022.  (*Id.*, PageID.7).  Thus, as to this issue, Smith's

complaint is about the approximate four-month period of time he went without the Addi-Paks solution.

### *Fluorometholone Eyedrops*

Smith also alleges that the steroid fluorometholone eyedrops he had been prescribed went interrupted from approximately January 16, 2022, to March 2, 2022, which caused pain, redness, and inflammation in and around his eyes. (*Id.*, PageID.8). He asserts that Dr. Haiderer knew that such an interruption could cause graft rejection in corneal transplant patients, yet disregarded this to cause him harm. (*Id.*).

### *Treatment Post Eye Surgery*

On March 15, 2022, Smith underwent eye surgery. (*Id.*). He alleges that when he awoke from the surgery, the surgeon instructed him not to remove the surgical protective shield until the next morning when the corneal specialist would remove it. (*Id.*). However, Smith alleges that, before he was examined by the corneal specialist, Dr. Haiderer instructed him to remove the protective shield. (*Id.*, PageID.9). Smith alleges that he protested this but that Dr. Haiderer "roughly ripp[ed] the shield and tape off his face without consent," and made a racist remark when Smith winced in pain. (*Id.*). Smith further alleges that Dr. Haiderer administered an intra-ocular pressure test by blowing a gust of strong air into his eye which caused him to jump in pain. (*Id.*). Smith alleges that Dr. Haiderer laughed at this and stated, "I didn't get your pressure[,] we have to do it again, I'll get you something for the pain." (*Id.*). Smith alleges that Dr. Haiderer unsuccessfully administered this test twice more. (*Id.*).

Smith further alleges that Defendants denied him a walking aid and talking books

and that McCauley told him to "submit a kite" if he wanted an ice detail for his eye. (*Id.*, PageID.11). Smith asserts that he protested this and said that Defendants were "doing this on purpose," to which Dr. Haiderer responded by telling him to leave the clinic or else he was going to segregation. (*Id.*). When Smith asked for his eyedrops and protective shield, he alleges that McCauley told him to leave and that "we will get the drops and shield to your unit." (*Id.*). Smith alleges that he was then escorted out by the corrections officer and was not given any eyedrops or treatment. (*Id.*).

Smith alleges that he did not receive the post-operation follow-up that was supposed to occur the day after surgery until "a week or so later." (*Id.*, PageID.12). He asserts that as a result he now has "maybe 2% usable vision," is "barely light perceptive in his right eye," and experiences "pain daily as well as flashing balls of light." (*Id.*).

*Summary Judgment Evidence*

While the parties characterize and interpret the evidence differently from one another, it generally corroborates the timeline of events as alleged by Smith. The Court will provide a brief discussion of the salient records here.

On October 4, 2021, in documentation completed for Smith's transfer to SRF, records reflect that Smith has a chronic unspecified disorder of the eye and adnexa as well as chronic keratoconus that is unspecified and bilateral. (ECF No. 63-3, PageID.635). These records also indicate that he was to be given one drop of fluorometholone eyedrops into both eyes daily for 363 days to expire on January 8, 2022, or until evaluated by a physician. (*Id.*). Importantly, the records state that Smith "may not have contact supplies in his room," that a nurse should provide him with the supplies for application in the

6

morning and should collect the lenses in the evening, and that his "[c]ase and solution need to be kept on the med cart." (*Id.*, PageID.636).

On October 7, 2021, a nurse noted that Smith "came to HC for hs med line and want sterile water in a tube for his hard contacts.  Nurse looked and could not find any.  Nurse did find a big bottle of sterile water that nurse placed in a medication bottle with dropper.  Nurse put Sterile Water on bottle with inmate's name and number.  Also, put nurse's initials and date given.  Inmate verbalized understanding and left HC without incident." (*Id.*, PageID.632).  Later that day, McCauley emailed Dr. Haiderer about Smith, asking what medications Smith needed for his eye, if he wears contacts, and, if so, what supplies he needs. (ECF No. 79-1, PageID.1581).  She also noted that Smith's accommodations needed to be updated, and that she had scheduled an appointment for October 18, 2021.  (*Id.*).

On October 8, 2021, McCauley noted in Smith's records that Smith submitted three kites about how he was supposed to have a follow-up appointment at an offsite institute for his ruptured eye, that he is not receiving anything for the pain, that he was refused "saline sterile water to wear [his] contacts," and that he is blind without his contacts.  (ECF No. 64-4, PageID.1130).  McCauley noted in the kite response that the follow-up appointment is scheduled but that she cannot provide a date or time for it, that she will ask the medical providers if he can be prescribed Tylenol, that he does not have an accommodation for saline ampules but that she will schedule an appointment with the optometrist to discuss the supplies he may need.  (*Id.*).  McCauley also noted that he had contact solution.  (*Id.*).

On October 12, 2021, Smith filed a grievance, SRT-2021-10-1169-12D1 (the "12D1 Grievance") asserting, "I've been wearing scleral contacts using saline/sterile water in

order to wear them.  Healthcare here at SRF refuse[s] to give me my saline/sterile water."  ECF No. 64-2, PageID.745).  That same day, a nurse noted in Smith's records that "CRV stating, 'eye pain tylenol not helping'.  Will schedule with optometrist Dr. Haiderer who is scheduled to be here next week."  (ECF No. 63-3, PageID.631).

On October 18, 2021, during Smith's first encounter with Dr. Haiderer, Dr. Haiderer noted that Smith had reported eye-related complaints wanting pain treatment and wanting saline solution for his left contact lens due to kerotoconus.  (*Id.*, PageID.627).  Dr. Haiderer screened Smith's vision and reported that Smith's left eye was 20/20 with corrective lenses.  (*Id.*).  The notes indicate that Smith had an eye patch on his right eye.  (*Id.*, PageID.628).  Dr. Haiderer assessed Smith to have "keratoconus, unspecified, bilateral" and that it was "At Treatment Goal."  (*Id.*).  Dr. Haiderer ordered two new medications for Smith to be started on October 20, 2021, and to be applied to Smith's right eye each morning and evening for 60 days: (1) "prednisolone acet o/s (10) 1% opth"; and (2) "erythromycin o/o (3.5gm) 0.5% opth."  (*Id.*).  Dr. Haiderer also requested an "optho/retinal spec – follow up visit" because ophthalmology had requested a B scan of Smith's retina on September 22, 2021.  (*Id.*).  Dr. Haiderer provisionally diagnosed Smith with a history of trauma to his right eye and "vision is light perception with no view of posterior pole."  (*Id.*).  Dr. Haiderer also noted that Smith was to be given access to saline solution, Tylenol, and the aforementioned follow-up appointment for the B scan.  (*Id.*, PageID.629).  Dr. Haiderer did not, however, order Addi-Paks for Smith.  (ECF No. 79-1, PageID.1628) ("I do not find an order from Dr. Haiderer on 10/18/2021 for sodium chloride").

On October 19, 2021, Smith's medical records state that he returned from an offsite

8

institute asserting that he was told he needs eye surgery and to see a retina specialist.  (ECF No. 63-3, PageID.626).  On October 20, 2021, Dr. Haiderer performed another eye exam on Smith.  (*Id.*, PageID.625).  Dr. Haiderer listed "refer to specialist" as a disposition.  (*Id.*).  On November 1, 2021, Smith's records state that he requested an increase in his pain medications for his eye pain and that a follow-up appointment with optometry was scheduled.  (*Id.*, PageID.620).  On November 2, 2021, Dr. Haiderer examined Smith again, conducted a chart review, noted that Smith was requesting sodium chloride ampules for his scleral contacts, noted that a prescription for contact lens sodium chloride was previously sent,[3] and noted that an offsite appointment was scheduled and pending.  (*Id.*, PageID.616-18).

On December 6, 2021, Dr. Haiderer examined Smith and ordered that Smith receive right eye retinal surgery in the form of a par plan vitrectomy due to a hemorrhage revealed from the previously ordered B scan.  (*Id.*, PageID.605).  However, on December 14, 2021, Smith refused to appear for his appointment for the offsite par plan vitrectomy.  (*Id.*, PageID.604).  Records indicate that Smith was told that "without prior shower, he would not have the surgery," and that Smith's refusal to attend the appointment was due to the fact that he was not able to shower.  (*Id.*, PageID.602).  Dr. Oliver noted that Smith "wishes the surgery to be rescheduled."  (*Id.*).  Dr. Oliver also noted the hemorrhage, that the risk

---

[3] As just noted, this assertion by Dr. Haiderer appears to be at odds with the prison's records, and Dr. Haiderer presented no document showing he had, in fact, ordered the sodium chloride solution for Smith at this time.  Indeed, it appears that Haiderer did not order that solution until at least December 30, 2021.  *See infra* at 10; *see also* ECF No. 64-2, PageID.744 ("the optometrist did not actually place orders for the saline [sic] until 1/3/2022.").

score was low, that they will attempt to reschedule the vitrectomy appointment, that they will evaluate as scheduled and needed, and that Smith "agrees to kite if problems worsen." (*Id.*, PageID.603).

On December 30, 2021, Dr. Haiderer examined Smith again.  (*Id.*, PageID.600). The records state that Smith again requested a prescription for sodium chloride ampules for his scleral contacts, which Dr. Haiderer prescribed.  (*Id.*, PageID.600-01).  Dr. Haiderer also noted that "H/C has supply for 1 month dispense."  (*Id.*, PageID.600).  Dr. Haiderer also noted that the vitrectomy was "rescheduled per H/C."  (*Id.*).  Dr. Haiderer also prescribed and ordered homatropine, prednisolone, and moxifloxacin.  (*Id.*, PageID.601).

On February 8, 2022, Dr. Haiderer examined Smith and they discussed that the ampules for his contact lenses were "back ordered" along with addressing Smith's pending appointment at an offsite eye institute.  (*Id.*, PageID.585).  Dr. Haiderer noted that Smith "verbalizes understanding." (*Id.*, PageID.586).  Dr. Haiderer also cleared Smith to be given a "sodium chloride irrigation bottle until ampules come in."  (ECF No. 64-4, PageID.1092). Finally, on February 10, 2022, Smith received "30 vials of Sodium Chloride 0.9%", with monthly refills thereafter.  (*Id.*).

On February 18, 2022, Smith's records note that Smith "kited stating that he is to receive eye drop Fluorometholone" and that he "was under the understanding he should be on this medication long term.  Currently no active order.  CRV for medication." (ECF No. 63-3, PageID.578).  The nurse scheduled an optometry exam for Smith.  (*Id.*).

On February 25, 2022, Dr. Oliver noted in Smith's records that Smith was "requesting fluorometholone, he is on prednisolone drops that duplicate the action.  Will

discuss with Dr. Haiderer need for fluorometholone." (*Id.*, PageID.577).  On February 28, 2022, Dr. Haiderer examined Smith and ordered a prescription for fluorometholone and artificial tears.  (*Id.*, PageID.575-76).  On March 2, 2022, Dr. Haiderer examined Smith and ordered another prescription for artificial tears.  (*Id.*, PageID.571).  On that same day, Dr. Haiderer emailed McCauley stating, "Inmate does have 20/20 acuity left eye with contact lenses.  He does not need an aide." (ECF No. 79-1, PageID.1596).

On March 7, 2022, McCauley signed a form denying Smith's application for the braille and talking book program, stating that she "evaluated the prisoner for eligibility requirements and find that qualifications are not met . . ." (ECF No. 79-3, PageID.1738).  Furthermore, this form states that the standard for qualifying for these type of aids for being blind is "[v]isual acuity of 20/200 or less in the better eye with correction . . ." (*Id.*).

On March 15, 2022, Smith's records state that he "returned from DMC [and stated] that he had membrane removed and scraped scar tissue off the cornea.  He state[d] that was all they di[d].  He was told that it was a 50/50 chance of regaining sig[ht] and they may have to go back and scrape again once everything heals.  [Smith] did return with 9 drops and 1 ointment that he is suppose to bring to the next appointment and the provider will provide instructions." (*Id.*, PageID.565).  The records provided by the offsite institute confirm that it performed a par plan vitrectomy on Smith that day and that the result was "[t]olerated without complications." (ECF No. 64-4, PageId.1256-57).

On March 16, 2022, Dr. Haiderer met with Smith.  (ECF No. 63-3, PageID.563-64).  Dr. Haiderer noted in Smith's records that the vitrectomy had been done the day before and that the hemorrhage had "worsened." (*Id.*, PageID.564).  Dr. Haiderer noted that he

"offered instruction on all drops and shield" and that "meds [were] provided" but that there was "no cooperation" and "no compliance." (*Id.*, PageID.563-64).  Dr. Haiderer requested that a post-operative follow-up for the vitrectomy be conducted by the offsite eye institute urgently.  (*Id.*, PageID.564).

On March 18, 2022, Smith's records state that he reported that "he is in so much eye pain.  The Tylenol and Motrin is not helping.  [Smith] states that it feels [like] thunder bolts and jack hammers in his eye that is constant.  He state[s] that he could not sleep last two nights." (*Id.*, PageID.556).  On March 21, 2022, Dr. Haiderer met with Smith and gave him instructions to continue wearing the protective shield on his eye until directed by ophthalmology. (*Id.*, PageID.554).  Dr. Haiderer noted that Smith had "Prednisone QID," "Moxfloxan QID," Atropine QD," and "Brimondine TID" medications in his possession. (*Id.*, PageID.553).

On March 29, 2022, Dr. Haiderer examined Smith and requested an ophthalmological follow-up with the offsite eye institute for the vitrectomy.  (*Id.*, PageID.547).  Dr. Haiderer noted that Smith's vision remains and that he can count fingers from one foot away.  (*Id.*).  That same day, the offsite surgeon who performed the vitrectomy noted in Smith's records that, "within" the 90-day post-operative period, Smith will have follow-up appointments that will include "the checking of his vision, eye pressure, dilation, and pictures."  (ECF No. 64-4, PageID.1250).

On April 11, 2022, a Step I grievance response denied Smith's grievance that he was denied the post-operation follow-up appointment by saying that the offsite institute "did not request a post op follow-up appointment with the off-site coordinator for one day

following the eye surgery." (ECF No. 79-2, PageID.1677).  On April 20, 2022, Smith was examined at an offsite institute and was reported as "doing well, globe formed and there is a good view to posterior segment.  Pt feels vision improving subjectively . . ." (ECF No. 64-4, PageID.1248).  On April 25, 2022, Dr. Haiderer examined Smith, again noting that there was a follow-up appointment scheduled "to evaluate for possible contact lens right eye." (*Id.*, PageID.950).

On May 4, 2022, Dr. Haiderer examined Smith, and again noted the possibility of Smith being able to use a contact lens in his right eye in the future.  (*Id.*, PageID.933).  The medical records state that Smith again requested "'Braille form and Talking Books program' since [he] claims he is eligible for services" and that Smith "[s]tates distance OK, near vision blurry.  Previous reading glasses tried not successful." (*Id.*).  Under the medical records' section entitled "Patient Education Topics," Dr. Haiderer wrote "Braille program not medical" and "H/C HUM notified." (*Id.*, PageID.935).  On May 19, 2022, McCauley sent an email confirming that she was aware of Smith's request for an audio book accommodation stating, but that he "does not meet the criteria for audio books and this was explained to him by [Dr. Haiderer] a couple weeks ago." (ECF No. 79-1, PageID.1597).

On June 3, 2022, MDOC staff sent an email that included McCauley and stated, "We need to try and get to the bottom of why the off-site clinic failed to inform us of the anticipated post-op f/u required in this case.  Goal is to prevent any repeat of this in future cases with other prisoners." (ECF No. 79-1, PageID.1592).

On June 14, 2022, Smith's medical records state that he returned after going to the local emergency room for a cut to his right eye and that he was "diagnosed with 3 corneal

abrasions and needs to see a specialist." (*Id.*, PageID.893). The next day, Smith was evaluated by a nurse practitioner who conducted an eye pressure test and noted that he was "Again legally blind. The patient denies any change in vision." *(Id.*, PageID.890).

Defendants now move for summary judgment as to all of Smith's claims.

### B. Legal Standards

Pursuant to Federal Rule of Civil Procedure 56, the Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Pittman v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011). A fact is material if it might affect the outcome of the case under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the Court assumes the truth of the non-moving party's evidence and construes all reasonable inferences from that evidence in the light most favorable to the non-moving party. *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).

The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion and must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'" *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio*

14

*Corp.,* 475 U.S. 574, 587 (1986)).   In response to a summary judgment motion, the opposing party may not rest on its pleadings, nor "'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander*, 576 F.3d at 558 (internal quotations omitted).

### C.  Analysis

#### i.  Dr. Haiderer

##### 1.  Exhaustion of Administrative Remedies

In his motion, Dr. Haiderer first argues that summary judgment is warranted on Smith's claims against him "as to his contact lens solution grievances" because he failed to properly exhaust his administrative remedies, as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a). (ECF No. 64).   The Court disagrees.

###### a.  The PLRA's Exhaustion Requirement

Under the Prison Litigation Reform Act ("PLRA"), a prisoner may not bring an action, "under [§ 1983] or any other Federal law," with respect to prison conditions until all available administrative remedies have been exhausted.   42 U.S.C. § 1997e(a); *Woodford v. Ngo*, 548 U.S. 81, 85 (2006). This "exhaustion" requirement serves two main purposes: it promotes efficiency by encouraging the resolution of claims at the agency level before litigation is commenced, and it protects administrative authority by allowing the agency an opportunity to correct its own mistakes before being haled into federal court. *See Woodford*, 548 U.S. at 89.   The Supreme Court has held that this "exhaustion requirement requires proper exhaustion." *Id.* at 93.   Proper exhaustion requires

"compliance with an agency's deadlines and other critical procedural rules." *Id.* at 90. Failure to exhaust is an affirmative defense that must be raised by a defendant, and on which the defendant bears the burden of proof. *See Jones v. Bock*, 549 U.S. 199, 216 (2007); *Vandiver v. Corr. Med. Servs., Inc.*, 326 F. App'x 885, 888 (6th Cir. 2009).

The PLRA attempts to eliminate unwarranted federal court interference with the administration of prisons and thus seeks to "affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter v. Nussle*, 534 U.S. 516, 525 (2002). The PLRA also was intended to "reduce the quantity and improve the quality of prisoner suits[.]" *Id.* at 524. Thus, it is essential for a plaintiff to properly exhaust his administrative remedies before filing suit by filing a grievance that complies with the prison grievance system's requirements regarding the allegations made in his complaint.

An untimely or otherwise improperly filed grievance, even though appealed through all steps of a grievance procedure, does not fulfill the exhaustion requirement of 42 U.S.C. § 1997e(a). *See Northington v. Abdellatif*, No. 16-12931, 2019 WL 9406499, at *7 (E.D. Mich. Aug. 16, 2019) ("The exhaustion requirement is mandatory and requires a prisoner to comply with state procedural rules such as time limits for filing grievances and other critical procedural rules."). Permitting an untimely or otherwise improperly filed grievance, even though appealed through all steps, to satisfy § 1997e(a)'s requirement "would permit a prisoner to bypass deliberately and flagrantly administrative review without any risk of sanction." *Woodford*, 548 U.S. at 97. The *Woodford* court explained:

A prisoner who does not want to participate in the prison grievance

16

system will have little incentive to comply with the system's procedural
rules unless noncompliance carries a sanction .... For example, a
prisoner wishing to bypass available administrative remedies could
simply file a late grievance without providing any reason for failing to
file on time. If the prison then rejects the grievance as untimely, the
prisoner could proceed directly to federal court. And acceptance of the
late grievance would not thwart the prisoner's wish to bypass the
administrative process; the prisoner could easily achieve this by
violating other procedural rules until the prison administration has no
alternative but to dismiss the grievance on procedural grounds. We are
confident that the PLRA did not create such a toothless scheme.

*Id.* at 95.  "The level of detail necessary in a grievance to comply with the grievance

procedures will vary from system to system and claim to claim, but it is the prison's

requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones*,

549 U.S. at 218.

### b.  The MDOC's Exhaustion Procedures

In determining whether a plaintiff has properly exhausted his claim, the only

relevant rules "are defined not by the PLRA, but by the prison grievance process itself."

Id. at 200.  In Michigan's correctional facilities, prisoner grievances are governed by

MDOC Policy Directive 03.02.130, entitled "Prisoner/Parolee Grievances" (the "Policy").

(ECF No. 64-5).  A state prisoner must first complete the process outlined in the Policy –

including, where applicable, pursuing a grievance through "all three steps of the grievance

process" – before he can file a lawsuit challenging the alleged unlawful conduct.  (*Id.* at ¶

B).

The Policy provides that if a prisoner cannot resolve his dispute with the staff

member involved within two days after becoming aware of the grievable issue, he has five

business days to file a Step I grievance.  (*Id.* at ¶ P).  After receipt of the grievance, the

17

grievance coordinator must determine if the grievance should be rejected pursuant to the Policy.  (*Id.* at ¶ X).  If the grievance is rejected, the grievance response shall state the reason for the rejection without addressing the merits of the grievance.  (*Id.*).  If the prisoner is dissatisfied with the Step I response, he may submit a grievance appeal to the Step II grievance coordinator within ten business days after receipt of the Step I response, or if no timely response is received, within ten business days of the date the response was due, including any extensions.  (*Id.* at ¶ BB).  After receipt of the grievance, the grievance coordinator must determine if the grievance should be rejected pursuant to the Policy; if so, the grievance response shall state the reason for the rejection without addressing the merits of the grievance.  (*Id.* at ¶ CC).  If the grievant is dissatisfied with, or does not receive, a Step II response, he has ten business days within which to file a final appeal at Step III. (*Id.* at ¶ FF). Again, an inmate may only pursue a claim in court if he has complied with his obligations at each of these three steps.

### c.   Smith Raised a Genuine Issue of Material Fact as to Whether He Properly Exhausted His Claim Against Dr. Haiderer

In his motion, Dr. Haiderer argues that Smith did not properly exhaust his "contact lens solution" claim against him because "he filed his first grievance before meeting Dr. Haiderer, did not name Dr. Haiderer in his grievance, and failed to appeal his grievance denial within a timely manner."  (ECF No. 64, PageID.667).  That argument lacks merit.

On October 12, 2021, Smith filed the 12D1 Grievance, asserting, "I've been wearing scleral contacts using saline/sterile water in order to wear them.  Healthcare here at SRF

18

refuse[s] to give me my saline/sterile water." (ECF No. 64-2, PageID.745). On November

10, 2021, the following Grievance Step I Response was written:

> The grievant arrived at SRF on 10-5-2021. The grievant was requesting single ampules of saline for his contacts. The grievant did not have an accommodation for this request and was being provided the solution designated on his accommodation. The grievant met with Dr. Haiderer on 11-2-2021 and the request was approved. The saline ampules have been ordered but are currently on back order. They will be provided as soon as they are received. There is no standard of care or policy violation described in this grievance.
>
> Grievance resolved.

(*Id.*, PageID.746).

Dr. Haiderer's arguments about the adequacy of the initial grievance lack merit. He faults Smith both for filing the grievance before meeting with Dr. Haiderer and for not specifically naming Dr. Haiderer in the grievance despite the fact the two had not yet met. But the mere fact that Smith had not yet met with Dr. Haiderer and wasn't aware of his specific identity when he filed the 12D1 Grievance does not mean the grievance could not exhaust a claim as to Dr. Haiderer.

Smith's 12D1 Grievance alleges that "Health Care here at SRF" refused to give him the contact lens solution he needed. Implicit in that accusation is that he had made a request for that solution or had an order for it, but that somebody within "Health Care" with the authority to issue it to him had refused to do so. Smith did not need to have met with Dr. Haiderer for that assertion to be true, and it makes sense given Dr. Haiderer's role as the prison's optometrist that the grievance was directed at him, even if Smith was not aware of his identity at the time he filed it, and even if ultimately it turns out that Dr. Haiderer

was not involved in the challenged conduct.  To that end, the Court notes that Smith specifically referenced needing to talk to "optometry" to resolve the issue.  (*Id.*, PageID.745).  And, indeed, Smith presented evidence – McCauley's October 7, 2021 e-mail to Dr. Haiderer – from which the Court can reasonably infer that he was, in fact, aware of Smith's specific needs days before Smith filed the 12D1 Grievance.  (ECF No. 79-1, PageID.1581).

Moreover, the information Smith provided was enough for the grievance reviewer to assess the grievance on its merits, and to direct its inquiry to Dr. Haiderer.  In fact, the Step I grievance response indicates that Smith met with Dr. Haiderer.  The grievance reviewer also specifically referred to Dr. Haiderer in the Step II grievance response.  (ECF No. 64-2, PageID.744 (stating "Grievant's request for saline solution was brought to the attention of the optometrist who addressed the issue on 10/18/2021 and 11/2/2021 indicating his agreement with grievant's request.  However, the optometrist did not actually place orders for saline until 1/3/2022.")).

In short, Smith raised a material question of fact as to whether his 12D1 Grievance gave "'prison officials fair notice of the alleged mistreatment or misconduct that forms the basis of the constitutional or statutory claim made against a defendant in a prisoner's complaint.'" *Walker v. Washington*, No. 23-2104, 2025 WL 1145719, at *3 (6th Cir. 2025) (quoting *Bell v. Konteh*, 450 F.3d 651, 654 (6th Cir. 2006)).

Dr. Haiderer also argues that Smith failed to properly exhaust his grievance because his Step II grievance was not timely filed.  Specifically, Dr. Haiderer asserts that Smith's Step II grievance was due on November 30, 2021, but that Smith waited to submit it until

December 10, 2021.  (ECF No. 64, PageID.668).  This argument lacks merit because Smith presented evidence, which Dr. Haiderer has not refuted, that MDOC specifically instructed him that his Step II grievance appeal was due on December 10, 2021.

Smith's Step II grievance form clearly states that Smith should direct his appeal to the "Warden's Office by 12/10/2021," and that the appeal was actually "Received by Step II Respondent" on that date.  (ECF No. 64-2, PageID.743).  Furthermore, the Step II grievance response clearly states: "NOTE: *An extension was requested and granted for this response to appeal*."  (*Id.*, PageID.744) (emphasis in original).  As noted above, *supra* at 18, the Policy allows for extensions.  Thus, at a minimum, a genuine issue of fact exists as to whether Smith's Step II appeal was untimely.

For all the above reasons, Dr. Haiderer's exhaustion arguments lack merit.

## 2.  Eighth Amendment Claims

To establish an Eighth Amendment claim for deliberate indifference, Smith must satisfy "both an objective and a subjective component."  *Broyles v. Correctional Medical Servs., Inc.*, 478 F. App'x. 971, 975 (6th Cir. 2012).  Specifically, he must show that he had a serious medical need (the objective prong) and that Defendants, being aware of that need, acted with deliberate indifference to it (the subjective prong).  *See Jones v. Muskegon County*, 625 F.3d 935, 941 (6th Cir. 2010).  There is no dispute that Smith's eye conditions involve serious medical needs, and thus satisfy the objective prong.  Dr. Haiderer seeks summary judgment as to the subjective prong of Smith's claim, arguing that the record evidence demonstrates there is no genuine dispute of material fact that he did not act with deliberate indifference to those serious medical needs.  (ECF No. 64, PageID.669-75).

As to the subjective prong, the plaintiff must show that the defendant possessed "a 'sufficiently culpable state of mind,' rising above negligence or even gross negligence and being 'tantamount to intent to punish.'" *Broyles*, 478 F. App'x at 975 (quoting *Horn v. Madison County Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994)).  Put another way, "[a] prison official acts with deliberate indifference if he knows of a substantial risk by failing to take reasonable measures to abate it.  Mere negligence will not suffice.  Consequently, allegations of medical malpractice or negligent diagnosis and treatment generally fail to state an Eighth Amendment claim of cruel and unusual punishment." *Broyles*, 478 F. App'x at 975 (internal quotations omitted).  As the Sixth Circuit has recognized, these requirements are "meant to prevent the constitutionalization of medical malpractice claims; thus, a plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001).  The *Comstock* court further explained:

> When a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation.  On the other hand, a plaintiff need not show that the official acted "for the very purpose of causing harm or with knowledge that harm will result."  Instead, "deliberate indifference to a substantial risk of serious harm to a prison is the equivalent of recklessly disregarding that risk."

*Id.* (internal citations omitted).

Courts distinguish between "cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011) (internal quotations

omitted).  "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976).

Smith alleges that Dr. Haiderer acted with deliberate indifference to his serious medical needs in a number of ways, including by: confiscating his Addi-Paks when he first arrived at SRF and then not ordering a prescription for months; withholding Smith's steroid fluorometholone eyedrops needed to maintain his corneal transplant grafts; providing inadequate post-operative care; and denying Smith access to visual accommodations.  The Court addresses each issue, in turn.

### a.  Confiscation of Addi-Paks upon Arrival at SRF

As an initial matter, Smith does not provide evidence that Dr. Haiderer was involved in any decision to confiscate his sodium chloride contact lens solution when he first arrived at SRF on October 5, 2021.  Rather, the evidence in the record indicates that Dr. Haiderer was not made aware of Smith's medical needs until McCauley emailed him on October 7, 2021, requesting that Dr. Haiderer examine him.  Accordingly, there is no issue of material fact as to whether Dr. Haiderer violated Smith's Eighth Amendment rights before October 7, 2021, and Dr. Haiderer is entitled to summary judgment on any such claim.

### b.  Failure to Order Sodium Chloride Solution

From the point in time when Dr. Haiderer received the October 7, 2021 email, there is a genuine issue of material fact as to whether he violated Smith's Eighth Amendment rights by not timely ordering the sodium chloride solution.  First, it is reasonable for the

Court to infer that Dr. Haiderer had notice of Smith's medical needs on October 7, 2021, when McCauley e-mailed him requesting that he examine Smith.  Specifically, McCauley emailed Dr. Haiderer about Smith asking what medications he needs for his eye, if he has contacts and, if so, what supplies he needs, noting that his accommodations need to be updated.  (ECF No. 79-1, PageID.1581).  Although Dr. Haiderer was not scheduled to see Smith until October 18, 2021, it appears Dr. Haiderer took no steps in the intervening time to answer McCauley's questions or address Smith's serious medical needs.

Second, Smith testified that when he first saw Dr. Haiderer on October 18, 2021, and asked about the sodium chloride contact solution he needed, Dr. Haiderer "threw [the Addi-Paks contact solution that Smith had come to SRF with] in the garbage . . . in front of [his] face." (ECF No. 64-3, PageID.825).  Smith further testified that when Dr. Haiderer did this, "[h]e was upset that I wrote the [12D1 G]rievance on him.  He told me that he got a [pen] too and his [pen's] bigger than mine. . . . And he made comments telling me that I should have worked things out and I shouldn't have wrote that grievance on him.  In fact, those words came out of his mouth." (*Id.*, at PageID.826-27).

Dr. Haiderer's November 2, 2021 notes from an encounter occurring approximately two weeks after his initial meeting with Smith clearly indicate that Dr. Haiderer agreed with Smith that he needed the sodium chloride contact lens solution by stating that a prescription for the solution had previously been sent.  (ECF No. 63-3, PageID.616-18); *see* (ECF No. 79-1, PageID.1623 ("The grievant was requesting single ampules of saline for his contacts. . . . The grievant met with Dr. Haiderer on 11-2-2021 and the request was approved.")); (*id.*, PageID.1626 ("Grievant's request for saline solution was brought to the

24

attention of the optometrist who addressed the issue on 10/18/2021 and 11/2/2021 indicating his agreement with grievant's request.")).   However, as noted above, Dr. Haiderer does not provide any evidence indicating that he actually placed such an order at that time, and other record evidence shows that no such order was placed until December 30, 2021 or January 3, 2022.  (*Id.*) (noting that Dr. Haiderer "did not actually place orders for the saline [sic] until 1/3/2022."); *see supra* at 9-10.  This was approximately two and a half months after Dr. Haiderer first agreed with Smith that he required the solution.

Construing the foregoing evidence in the light most favorable to Smith, he raised a material question of fact that Dr. Haiderer acted with deliberate indifference when, for a period of two and a half months, he did not provide Smith the sodium chloride solution the doctor agreed he needed.[4]  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  This conclusion is further supported by the questions of fact that exist as to whether Dr. Haiderer acted out of a retaliatory animus based on Smith's filing of the 12D1 Grievance.  *See infra* at 29-31.

### c.  Withholding Steroid Fluorometholone Eyedrops

Smith also argues that Dr. Haiderer's withholding of his steroid fluorometholone eyedrops violated the Eighth Amendment.   While Dr. Haiderer moved for summary judgment as to Smith's deliberate indifference claim regarding the sodium chloride solution, he did not advance any specific argument about the alleged withholding of Smith's steroid fluorometholone eyedrops.   Accordingly, Dr. Haiderer is not entitled to

---

[4] While Dr. Haiderer argues that Smith was not harmed by not having the solution, a genuine issue of material fact exists as to this conclusion given the ample evidence provided about Smith's eyes being red and swollen and largely non-functional during this time period.

summary judgment as to this claim.  *United States v. Stewart*, 628 F.3d 246, 256 (6th Cir. 2010) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones.") (citation omitted).

### d.   Post-Operative Care

Smith argues that, after his March 15, 2022 surgery, Dr. Haiderer's treatment was deliberately indifferent by refusing to send him to a follow-up offsite appointment and by otherwise providing inadequate care.  Dr. Haiderer is entitled to summary judgment as to this claim.

Regarding the follow-up offsite appointment, there is no evidence of deliberate indifference by Dr. Haiderer.  Rather, the evidence Smith provides demonstrates that the medical staff at SRF was "unaware" that he was supposed to have this appointment, and that it was the offsite eye institute that mistakenly "did not request" it.  (ECF No. 79-2, PageID.1677-78); *see* (ECF No. 79-1, PageID.1592 ("We need to try and get to the bottom of why the off-site clinic failed to inform us of the anticipated post-op f/u required in this case.")).  Moreover, Dr. Haiderer saw Smith the same day that Smith was supposed to have the follow-up appointment and immediately requested that a post-operative follow-up for the vitrectomy be conducted by the offsite eye institute urgently.  (ECF No. 63-3, PageID.564).  Thus, as to this issue, far from being deliberately indifferent to Smith's medical needs, record evidence shows that Dr. Haiderer was reasonably addressing them.

Regarding Smith's claim based on alleged inadequate post-operative treatment,

26

Smith points to Dr. Haiderer taking off his eye shield to conduct an examination even though Smith said he was supposed to keep it on, giving confusing instructions on the use of eye drops, and using an intra-ocular pressure test that was painful.  Courts distinguish between "cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Alspaugh*, 643 F.3d at 169.  "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake*, 537 F.2d at 860 n.5.

Smith does not dispute that Dr. Haiderer provided him post-operative treatment; he simply disputes Dr. Haiderer's medical judgment as to that treatment.  However, Dr. Haiderer was not required to agree with Smith's instructions as to how to conduct his medical examination.  Thus, the post-operative issues Smith complains about at most sound in medical negligence, and do not rise to the level of deliberate indifference, and Dr. Haiderer is entitled to summary judgment on this claim.  *See Alspaugh*, 643 F.3d at 169; *Westlake*, 537 F.2d at 860 n.5.

### e.  Denial of Visual Accommodations

Smith also asserts a deliberate indifference claim based on Dr. Haiderer allegedly denying him access to the braille and talking book programs.  Dr. Haiderer argues that the decision to provide these aids is "not medical," "could not be assessed by [him]," and that, in any event, Smith did not qualify for them.  (ECF No. 64, PageID.674).  Dr. Haiderer is not entitled to summary judgment on this claim.

27

First, Dr. Haiderer failed to meet his initial burden of identifying particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact. *See Celotex*, 477 U.S. at 325; *Alexander*, 576 F.3d at 558; Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . ."). In fact, the roughly one-page argument in his summary judgment motion does not contain a single citation to the record (ECF No. 64, PageID.674-75), and it is not the Court's job to scour the hundreds of pages of medical and other records the parties have filed to attempt to find the salient evidence.

Second, Dr. Haiderer's arguments are circular. On the one hand, he claims that "requests to join the braille form and talking book programs are not medical and could not be assessed by [him]." (ECF No. 64, PageID.674). On the other hand, he asserts that an MDOC grievance reviewer "responded that Smith did not qualify for the talking book program, and did not require a personal walking aid or assistant." (*Id.*). As far as the Court can tell, though, the grievance reviewer's finding was based mostly on representations from Dr. Haiderer about Smith's needs for the aids. (ECF No. 79-1, PageID.1597; ECF No. 64-2, PageID.703-05). And, contrary to Dr. Haiderer's self-serving and conclusory assertions about his non-role in assessing Smith's eligibility for the programs, the grievance reviewer indicated, "[t]he optometrist is considered the authority re. this matter . . . the optometrist has determined grievant does not qualify for the services he has requested." (*Id.*).

Finally, the Court notes that in the record related to Smith's request for the programs, Dr. Haiderer noted, "[p]revious reading glasses tried not successful" (ECF No. 64-4, PageID.933), and other evidence in the record, including from a medical provider

28

who approved Smith for the aid programs, indicated that Smith could only wear the scleral lens for up to about 8 hours per day (ECF No. 79-2, PageID.1716), which would imply his need for visual aids the remainder of the day.

In sum, Dr. Haiderer did not show, through a proper evidentiary presentation, that he is entitled to summary judgment on this claim.

### 3.   First Amendment Retaliation Claim

Section 1983 "prohibit[s] state employees from violating a person's constitutional rights." *Green v. City of Southfield*, 925 F.3d 281, 284 (6th Cir. 2019).  It is settled law that "a public official's retaliation against an individual exercising his or her First Amendment rights is a violation of § 1983." *Anders v. Cuevas*, 984 F.3d 1166, 1185 (6th Cir. 2021).   Smith alleges that Dr. Haiderer violated his First Amendment rights by withholding Smith's contact solution to retaliate against Smith for filing a grievance against him.  (*See* ECF No. 1, PageID.4; ECF No. 79, PageID.1502-03).

To state a First Amendment retaliation claim, a plaintiff must show that (1) he engaged in constitutionally protected speech; (2) an adverse action was taken against him that would chill or silence a person of ordinary firmness from future First Amendment activities; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by his protected conduct.  *Harper v. City of Cleveland*, 781 F. App'x 389, 396 (6th Cir. 2019) (quoting *Gillis v. Miller*, 845 F.3d 677, 683 (6th Cir. 2017)) (cleaned up).

Dr. Haiderer's only argument concerns the third element.    (ECF No. 64, PageID.675-76).[5]  Specifically, Dr. Haiderer argues:

> To the extent that Smith alleges any first amendment allegations against Dr. Haiderer as a result of treatment he received at the Saginaw Correctional Facility, Smith cannot demonstrate the elements of a retaliation claim. As referenced above, Smith filed his first step I grievance before ever meeting Dr. Haiderer, and he did not name Dr. Haiderer in the first step I grievance he filed on October 8, 2021. In fact, he did not name Dr. Haiderer in any grievances or appeals until March 15, 2022 in grievance identifier SRF 202203029812F.
>
> This grievance was filed after Dr. Haiderer had treated Smith for months, and after Dr. Haiderer allegedly provided inadequate medical care on Smith's post- operative eye. Similarly, the final grievance against Dr. Haiderer was filed regarding a completely distinguished issue; which was the braille and talking book programs that could not be addressed by Dr. Haiderer. Therefore, Smith can't establish the causal connection between elements one and two – that Dr. Haiderer's actions were motivated by Smith filing any grievances against him.

(*Id.*).

Dr. Haiderer's argument is even more flawed than his similar one that Smith could not have properly exhausted his deliberate indifference claim because he filed the 12D1

---

[5] Indeed, the first two elements seem not to be in dispute.  As to the first element, the Sixth Circuit has held that "'[a]n inmate has an undisputed First Amendment right to file grievances against prison officials on his own behalf.'"  *Richards v. Perttu*, 96 F.4th 911, 917 (6th Cir. 2024).  "The principal limitation to this constitutional right is if the grievance is 'frivolous.'"  *Richards*, 96 F.4th at 917 (quoting *Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010)).  Since Smith's 12D1 Grievance complained about the withholding of his contact lens solution, which he did, in fact, require, his grievance was not "frivolous," and was thus constitutionally protected speech.  "*Actual* deterrence need not be shown" to satisfy the second element.  *Harbin-Bey v. Rutter*, 420 F.3d 571, 579 (6th Cir. 2005) (emphasis in original).  "[T]his element is not an overly difficult one for the plaintiff to meet."  *Lappin*, 630 F.3d at 472.  Consequently, "unless the claimed retaliatory action is truly inconsequential, the plaintiff's claim should go to the jury." *Bell v. Johnson*, 308 F.3d 594, 603 (6th Cir. 2002) (citation and internal quotation marks omitted).   Clearly, refusing to supply an inmate with the specific type of contact lens solution he needs to safely wear his contacts constitutes an adverse action.

Grievance before meeting Haiderer in person.  As explained above, the MDOC grievance reviewer specifically referenced Dr. Haiderer, so a reasonable inference is that he knew of the 12D1 Grievance when he first met Smith.  And, Smith contends that when they did meet shortly after he filed that grievance, Dr. Haiderer specifically referenced Smith's filing of the grievance as the reason he was withholding Smith's contact lens solution.  If true, that would be clear retaliation for filing the October 8, 2021 12D1 Grievance.

In sum, there is at least a genuine issue of material fact regarding the third element of Smith's First Amendment retaliation claim.  A reasonably jury could conclude from the evidence that Haiderer subjected Smith to an adverse action, *i.e.*, refusing to give him the sodium chloride solution required for his specialized contact lenses, because of Smith's constitutionally protected speech, *i.e.*, filing a grievance.

For all of these reasons, Dr. Haiderer's summary judgment motion as to Smith's First Amendment retaliation claim should be denied.

### 4.   ADA

In his summary judgment motion, Dr. Haiderer did not address Smith's ADA claim. (ECF No. 64).  In fact, despite acknowledging that Smith brought an ADA claim (*id.*, PageID.661) the motion does not make any other reference to this claim.  For that reason alone, the Court could decline to grant summary judgment to Dr. Haiderer on this claim. And, while Dr. Haiderer did address this claim in his reply brief (ECF No. 64, PageID.674-75), he essentially put forth the same flawed arguments that the Court rejected above, *supra* at 27-29, as to Smith's deliberate indifference claims about the visual aid programs he requested.  (*Id.*).  For all of the reasons explained above, then, Dr. Haiderer has not shown

31

he is entitled to summary judgment as to this claim.

### 5.   Remaining Claims (Fifth Amendment Claim, Fourteenth Amendment Claim, and Equal Protection Clause Claim)

Finally, the Court addresses Smith's claims against Dr. Haiderer under the Fifth and Fourteenth Amendments.  While Smith did not clearly articulate the contours of these claims, he appears to have abandoned them.   In his summary judgment motion, Dr. Haiderer asserts that "[t]he Fifth Amendment protects civil detainees from punishment . . . .  And the Fourteenth Amendment protects pretrial detainee claims 'under the same rubric' as Eighth Amendment prisoner claims.  [] Considering Smith was already an inmate and not a pretrial or civil detainee at the time of his grievances, treatment, and this litigation, Smith does not have standing to bring Fifth or Fourteenth Amendment allegations against Dr. Haiderer for the deliberate indifference to his serious medical needs."  (ECF No. 64, PageID.676).  Smith did not advance any opposition in his response or sur-reply to Dr. Haiderer's arguments, and can therefore be deemed to have abandoned those claims. *Stewart*, 628 F.3d at 256.  Moreover, generally speaking, Dr. Haiderer's arguments are sound.  *See Malam v. Adducci*, 481 F. Supp. 3d 631, 634 (E.D. Mich. 2020) ("The Fifth Amendment protects civil detainees from punishment, *see Bell v. Wolfish*, 441 U.S. 520, 535 [] (1979), whereas the Eighth Amendment protects prisoners from cruel and unusual punishment . . .") (citing *Estelle v. Gamble*, 429 U.S. 97 [] (1976); *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563 (6th Cir. 2013) ("[p]retrial detainee claims . . . sound in the Due Process Clause of the Fourteenth Amendment rather than the Eighth Amendment, are

analyzed under the same rubric as Eighth Amendment claims brought by prisoners").[6]

Accordingly, Dr. Haiderer's motion should be granted as to these claims.

### ii.        McCauley

In her motion, McCauley argues that she is entitled to summary judgment on various grounds, including qualified immunity. As discussed below, Smith's claims against her fail on the merits.

### 1.        Eighth Amendment Claims

Smith contends that McCauley acted with deliberate indifference to his medical needs by confiscating his Addi-Paks when he first arrived at SRF, by withholding the sodium chloride contact lens solution, and by not providing the visual aid accommodations. McCauley is entitled to summary judgment on each of these claims.

### a.  Confiscation of Addi-Paks upon Arrival at SRF

Smith alleges that McCauley confiscated his Addi-Paks when he first arrived at SRF. McCauley met her initial burden of proof as to that claim in two ways. First, she submitted an affidavit in which she averred that "[a]s the Health Unit Manager, I am not involved with prisoner property assessments upon transfer from another facility," and that

---

[6] The Court notes that in his complaint, Smith makes vague references to the "equal protection clause" and "access to the courts." (ECF No. 1, PageID.13). Those claims should be dismissed under 28 U.S.C. §1915(e)(2)(B) for failure to state a claim for relief. Smith's complaint provides no allegations from which the Court could find he was denied the ability to petition the courts for redress or that he was treated differently from any other similarly situated inmate on account of his membership in a protected class. *Sproessig v. Blessman*, No. 1:19-CV-693, 2022 WL 4244322, at *5 (W.D. Mich. June 28, 2022), report and recommendation adopted, No. 1:19-CV-693, 2022 WL 3334480 (W.D. Mich. Aug. 12, 2022) ("In order to maintain a Fourteenth Amendment Equal Protection claim, the plaintiff must prove that he is a member of a protected class and that a state actor purposefully discriminated against him because of his class membership.").

"[a]t no time, did I confiscate any of Prisoner Smith's property."  (ECF No. 63-2, PageID.543).  Second, McCauley attached an official MDOC "Transfer" document that provides incoming prison staff with instructions about the prisoner's medications, which specifically stated, "Inmate may not have contact supplies in his room . . . Case and solution need to be kept on the med cart."  (ECF No. 63-3, PageID.636).  Smith did not offer any admissible evidence demonstrating that McCauley confiscated his Addi-Paks.  And, even if Smith had presented such evidence, in light of the aforementioned Transfer document, Smith cannot establish the subjective prong of his deliberate indifference claim against McCauley because any removal of the Addi-Paks from his cell would have been consistent with the Transfer document instructions.  (*Id.*).

### b. Failure to Order Sodium Chloride Solution and Fluorometholone

Unlike with his allegations against Dr. Haiderer, Smith does not allege that McCauley was involved in his contact lens solution prescription or fluorometholone eyedrops not being ordered for months.  Indeed, when asked at his deposition whether McCauley "was giving [him] any treatment prior to 3-15-2022; direct treatment?," Smith answered, "No, ma'am . . . I do not believe she did."  *See* (ECF No. 64-3, PageID.770-72).  He later testified, "I had very little interaction with Defendant McCauley."  (*Id.*, PageID.776-78).  Moreover, the record evidence demonstrates that McCauley attempted to help Smith right away when these issue was brought to her attention.  Specifically, McCauley conveyed her attempts to help Smith in her kite response on October 8, 2021, noting that Smith did not have an accommodation for saline ampules, and therefore

34

scheduled an appointment for Smith with Dr. Haiderer to discuss the supplies he may need. (ECF No. 64-4, PageID.1130).

McCauley's emails from that period substantiate what she told Smith in the kite response. For instance, in a response to another healthcare professional asking her for help in dealing with Smith's request for his sodium chloride contact solutions, McCauley responded, "I think I want to add him to Dr. Haiderer's list next time he is here. I think that those accommodations were from immediately after his surgery and while he was in an RTP. Most shouldn't apply now. We still need to know what he needs re: contacts. I'll find out." (ECF No. 77, PageID.1385). She also emailed Dr. Haiderer saying that they need to know what medications Smith needs for his eye, noting that his accommodations need to be updated, and stating that she scheduled an appointment for the two to meet. (ECF No. 79-1, PageID.1581).

Finally, in McCauley's affidavit, she avers that she had no authority to make the decision to provide, or withhold, Smith's lens solution, stating: "As the Health Unit Manager, I am not involved with issuing prisoners with sodium chloride 0.9% solution or 'Addi-packs,' as named in Prisoner Smith's complaint." (ECF No. 63-2, PageID.543). Smith does not offer any evidence suggesting otherwise, and his conclusory assertion that McCauley "elect[ed] to disregard Smith's need" for the sodium chloride contact solution does not create a material question of fact. (ECF No. 82, PageID.1752).

For all of these reasons, Smith fails to satisfy the subjective component of his deliberate indifference claim that McCauley withheld his contact lens solution.

### c.  Denial of Visual Aid Accommodations

Finally, Smith alleges that McCauley was deliberately indifferent by denying him access to the braille and talking book programs.  McCauley argues, among other things, that Smith does not provide any evidence for this.  The Court agrees with McCauley.

The evidence in the record demonstrates that Dr. Haiderer emailed McCauley on March 2, 2022, stating, "Inmate does have 20/20 acuity left eye with contact lenses.  He does not need an aide."  (ECF No. 79-1, PageID.1596).  Furthermore, the record shows that, on May 4, 2022, Dr. Haiderer examined Smith again, and noted the possibility of Smith being able to use a contact lens in his right eye in the future.  (ECF No. 63-3, PageID.933).  The medical records from that day state that Smith requested "'Braille form and Talking Books program' since [he] claims he is eligible for services" and that Smith "[s]tates distance OK, near vision blurry.  Previous reading glasses tried not successful." (*Id.*).  Under the medical records' section entitled "Patient Education Topics," Dr. Haiderer wrote "Braille program not medical" and "H/C HUM notified."  (*Id.*, PageID.935).

Although Smith provides evidence that McCauley was the one who signed the denial form on March 7, 2022, stating that she "evaluated the prisoner for eligibility requirements and find that qualifications are not met" (ECF No. 79-3, PageID.1738), that alone does not lead to a reasonable inference that she acted with deliberate indifference in doing so.  As discussed above, the very doctor who was responsible for Smith's eye examinations and care specifically instructed her that Smith did not qualify for the programs.  He even gave her medical information regarding Smith's visual acuity that did not meet the requirements as stated on the form McCauley completed.  In fact, the form

specifically states that the standard for qualifying for the type of aids at issue is "[v]isual acuity of 20/200 or less in the better eye *with correction* . . ." (ECF No. 79-3, PageID.1738) (emphasis added), which is exactly what Dr. Haiderer told her was Smith's case (whether or not it was accurate).

Under those circumstances, Smith failed to raise a material question of fact as to the subjective prong of his deliberate indifference claim against McCauley. Indeed, it would be unreasonable to conclude that McCauley acted with deliberate indifference by simply following the doctor's instructions and accurately applying the medical information he provided her to complete the check-box form.

Accordingly, McCauley is entitled to summary judgment on this claim.

### 2.    ADA Claim

To the extent Smith has an ADA claim against McCauley, it is based on the same set of facts as his deliberate indifference claim about the visual aids. And the ADA claim fails for many of the same reasons just explained. To prevail on his ADA claim against McCauley, Smith must show that (1) he has a disability; (2) he is otherwise qualified to receive the benefit or service at issue; and (3) he is being excluded from participation in, being denied the benefit of, or being subjected to discrimination in the provision of, the services, programs, or activities of the public entity because of his disability. *See Dillery v. City of Sandusky*, 398 F.3d 562, 567 (6th Cir. 2005).

As explained above, the undisputed evidence is that McCauley acted based on instructions and medical information she received from Smith's treating physician, and she completed the visual aid denial form in a manner consistent with that medical information.

Accordingly, even if Smith could meet the first two prongs of his ADA claim, he failed to raise a material question of fact as to the third prong because he cannot show that Smith engaged in conduct on account of his disability.

### 3. Remaining Claims (Fifth Amendment Claim, Fourteenth Amendment Claim, and Equal Protection Claim)

Finally, the Court addresses Smith's claims against McCauley under the Fifth and Fourteenth Amendments. While Smith did not clearly articulate the contours of these claims, as with Dr. Haiderer, he appears to have abandoned them. McCauley, unsure – reasonably in light of his extremely vague pleading – of exactly what such claims Smith was attempting to bring against her, moved for summary judgment as to his "Equal Protection" claim. (ECF No. 63, PageID.533). Smith failed to address that argument in his response brief, and can therefore be deemed to have abandoned that claim. *United States v. Stewart*, 628 F.3d at 256. And, the same substantive analysis the Court provided above as to why Dr. Haiderer is entitled to summary judgment on these claims applies to McCauley, as well. *See supra* at 32-33. Accordingly, McCauley is entitled to summary judgment as to any such claims.

### III.    CONCLUSION

For the reasons set forth above, **IT IS RECOMMENDED** that McCauley's motion for summary judgment **(ECF No. 63)** be **GRANTED** and Dr. Haiderer's motion for summary judgment **(ECF No. 64)** be **GRANTED IN PART AND DENIED IN PART**; specifically, Dr. Haiderer's summary judgment motion should be **GRANTED** as to Smith's Eighth Amendment claims related to the alleged confiscation of his Addi-Paks

upon his arrival at SRF and his post-operative care, and as to his claims under the Fifth and Fourteenth Amendments, but should otherwise be **DENIED**.  **IT IS FURTHER RECOMMENDED** that the Jane Doe defendant be **DISMISSED WITHOUT PREJUDICE**.

Dated: August 28, 2025                            s/David R. Grand
Ann Arbor, Michigan                              DAVID R. GRAND
                                                 United States Magistrate Judge

### NOTICE TO THE PARTIES REGARDING OBJECTIONS

Within 14 days after being served with a copy of this Report and Recommendation, any party may serve and file specific written objections to the proposed findings and recommendations set forth above.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1).  Failure to timely file objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005).  Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have.  *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).  Copies of any objections must be served upon the Magistrate Judge.  *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy.  *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1).  Any such response

should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 28, 2025.

s/Eddrey O. Butts

EDDREY O. BUTTS
Case Manager